

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RMT:DMP
F. #2009R01793

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 15, 2019

**<u>Redacted for Public Filing</u>**

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     United States v. Najibullah Zazi
<u>Criminal Docket No. 09-663 (S-1) (RJD)</u>

Dear Judge Dearie:

  The government respectfully submits this letter in advance of the defendant Najibullah Zazi's sentencing hearing, which is currently scheduled for April 10, 2019, at 11 a.m.  The purpose of this letter is to describe the offense conduct and applicable United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") calculations, and to move pursuant to Section 5K1.1 of the Guidelines to allow the Court in its discretion to depart below the applicable advisory Guidelines range based upon the substantial assistance provided by the defendant.

I.  <u>Offense Conduct</u>[1]

  On February 22, 2010, Zazi pleaded guilty, pursuant to a cooperation agreement, to all counts of a superseding information charging him with conspiracy to use weapons of mass destruction against persons and property within the United States, in

---

  [1] The offense conduct set forth below is drawn from the Presentence Investigation Report ("PSR") and from the defendant's testimony at two trials in the Eastern District of New York, as described in more detail below.  Copies of the transcripts of Zazi's testimony are attached as Exhibits 1 and 2, but because of their size, are not being uploaded to ECF.

violation of Title 18, United States Code, Section 2332a; conspiracy to commit murder in a foreign country, in violation of Title 18, United States Code, Section 956; and providing material support and resources to al-Qaeda, in violation of Title 18, United States Code, Section 2339B. The government agrees with the detailed description of the offense conduct set forth in the Presentence Investigation Report ("PSR").

In summary, Zazi traveled with two other individuals from the United States to Pakistan in 2008 to wage jihad (violent struggle) against American and coalition forces in Afghanistan. While in Pakistan, Zazi and his co-conspirators joined al-Qaeda, received training in weapons and explosives, and agreed to conduct a terrorist attack in New York City. After returning to the United States, Zazi and his co-conspirators planned to carry out a suicide bombing attack on the New York City subway system.

A.    Zazi's Path to Radicalization

Zazi, a citizen of Afghanistan, grew up in Peshawar, a city in Pakistan's Northwestern Frontier near the border region of Pakistan and Afghanistan. In 1999, when Zazi was approximately 14 years old, he moved to Queens, New York. Zazi attended Flushing High School in Flushing, Queens, but did not graduate. He dropped out in approximately 2003, having attended high school through 11th grade. After dropping out, Zazi held several jobs, working in a grocery store and in a fast-food restaurant and then becoming a street vendor with a coffee cart in downtown Manhattan.

Zazi first began to support violent jihad in approximately late 2006 when his friend Adis Medunjanin gave him audio tapes of lectures by Sheikh Anwar al-Awlaki. Al-Awlaki, who is now deceased, was a Yemeni-American imam who rose to become a leader of al-Qaeda in the Arabian Peninsula. Zazi listened to al-Awlaki lectures on a daily basis, totaling hundreds of hours of lectures, both on his own and with Medunjanin and another friend Zarein Ahmedzay. Around this time, Zazi found lectures on the Internet by Sheikh Abdullah Faisal, a Jamaican preacher who was convicted in the United Kingdom on charges including soliciting murder, and listened to Faisal's lectures on his iPod. As a result of listening to al-Awlaki's and Faisal's lectures, Zazi, along with Ahmedzay and Medunjanin, came to believe that being a true Muslim involved not just praying and studying the Qu'ran but participating in jihad and fighting to defend Muslims who were oppressed in Iraq and Afghanistan.

By 2008, Zazi was watching propaganda videos by al-Qaeda and the Taliban on the Internet, including videos of mortar attacks, suicide attacks and fighting between the Taliban and American and NATO forces in Afghanistan. Zazi came to view the American and NATO forces in Afghanistan as occupying forces. Zazi believed that America was

behind the September 11, 2001 attacks, and was using 9/11 as a pretext to occupy Afghanistan. Zazi believed that he had a personal duty to go and fight against American and NATO forces in Afghanistan.

During the summer of 2008, Zazi, Ahmedzay and Medunjanin made what they called a "covenant," or agreement, to travel together to Pakistan with the goal of joining the Taliban and fighting violent jihad against American and coalition troops in Afghanistan. In a meeting outside a mosque in Flushing, New York, the three men made an oath to fight alongside the Taliban mujahideen (holy warriors) and kill American soldiers. They agreed that they would seek "victory or shehadeh" (martyrdom), i.e., defeating American forces in Afghanistan or dying in the process. They agreed on a cover story that Zazi and Ahmedzay were planning to visit their families in Pakistan and Afghanistan, respectively, while Medunjanin was traveling to Pakistan to find a wife.

In advance of their travel, Zazi signed up for a number of credit cards, which he used to purchase tickets to Pakistan for himself, Ahmedzay and Medunjanin as well as electronics, computers, cameras, batteries and memory cards that he intended to give to the Taliban. Zazi also took out cash advances on these credit cards so that the three men would have money to pay for expenses. Between the charges and the cash advances, Zazi incurred approximately $50,000 on these credit cards to purchase supplies and obtain additional cash. Because Zazi did not intend to return to the United States, he had no intention of ever paying off the balances on his credit cards. On August 28, 2008, Zazi, Ahmedzay and Medunjanin traveled from Newark Liberty International Airport in Newark, New Jersey to Peshawar, Pakistan.

B.    Zazi Joins al-Qaeda

After arriving in Pakistan, Zazi, Ahmedzay and Medunjanin stayed in Peshawar at Zazi's uncle's house. Zazi then took Ahmedzay and Medunjanin to arrange a car to transport Ahmedzay and Medunjanin across the border to Afghanistan to join the Taliban. Zazi intended to stay with his relatives in Peshawar so that he could spend time with his wife (whom he had married in 2006 during a prior trip to Pakistan) and family before joining Ahmedzay and Medunjanin in Afghanistan later.

However, Ahmedzay and Medunjanin's effort to cross the border by taxi was unsuccessful. Ahmedzay and Medunjanin were stopped at a checkpoint, questioned by Pakistani police, and taken to a police station because the police apparently believed that Medunjanin was an American spy and Ahmedzay was his translator. Ahmedzay was able to convince the police that he and Medunjanin were Muslim. They were released, and returned to Zazi's uncle's house.

Zazi's cousin Amanullah Zazi then brought Zazi, Ahmedzay and Medunjanin to a Peshawar mosque because the imam at the mosque could help them get to Afghanistan. At the mosque, Zazi, Ahmedzay and Medunjanin spoke to a Taliban recruiter who stated that he had helped John Walker Lindh join the Taliban. Lindh is a U.S. citizen who was captured as an enemy combatant during the U.S. invasion of Afghanistan in 2001. Zazi, Ahmedzay and Medunjanin arranged to go with the recruiter the next day to join the Taliban. However, the recruiter did not return to pick them up.

Zazi, Ahmedzay and Medunjanin ultimately traveled with a second individual that they had met through the mosque, an al-Qaeda facilitator named "Ahmad." Ahmad informed Zazi, Ahmedzay and Medunjanin that he would take them to Waziristan, which is in the Federally Administered Tribal Areas (FATA) on the border of Pakistan and Afghanistan. Ahmad first took Zazi, Ahmedzay and Medunjanin to a guesthouse in Miram Shah in North Waziristan, where they met with senior al-Qaeda leaders they knew as "Abdul Hafeez" (later identified as al-Qaeda external operations chief Saleh al-Somali) and "Ibrahim" (later identified as British and Pakistani al-Qaeda external operations operative Rashid Rauf). Abdul Hafeez and Ibrahim encouraged Zazi, Ahmedzay and Medunjanin to return to the United States to conduct a martyrdom operation – a suicide bombing attack – rather than remain to fight on the battlefield in Afghanistan. Zazi, Ahmedzay and Medunjanin initially told the al-Qaeda leaders that they were not interested in returning to the United States, reaffirming their desire to fight against American and coalition forces in Afghanistan. They agreed, however, to keep an open mind.

C.    Zazi Receives al-Qaeda Military Weapons Training

Zazi, Ahmedzay and Medunjanin were eventually taken to an al-Qaeda training compound in South Waziristan. At the compound, the three men met additional al-Qaeda operatives, including "Hamad" (later identified as Adnan el-Shukrijumah, an al-Qaeda operative who spent time in the United States), who provided them with basic explosives training, and "Yousef" (later identified as Canadian citizen Ferid Imam), who provided them with military weapons training. During their time at the compound, which lasted approximately one to two weeks, the three men received training on both light and heavy weaponry, including AK-47s, handguns, PK machine guns and rocket propelled grenades. Their training included instruction on how to use, assemble, dismantle and clean the weapons. The al-Qaeda trainers also taught them how to identify the weapons in Arabic so they would be able to better communicate with other fighters during combat in Afghanistan. The training included hands-on training with the weapons, including how to hold and fire each weapon, and each of the three men were in regular possession of these weapons. Near the end of their training, the three men each had the opportunity to fire the weapons on which

they had received training.  The al-Qaeda trainers took them to a firing range and each fired the firearms and the rocket launchers and threw the grenades.

During their time at the training compound, Zazi, Ahmedzay and Medunjanin also received basic explosives training from Hamad.

During the training, Zazi, Ahmedzay and Medunjanin continued to have discussions with Abdul Hafeez and other al-Qaeda leaders about conducting a martyrdom operation in the United States.  Hamad showed the men videos produced by as-Sahab, the media wing of al-Qaeda, about past suicide bombings al-Qaeda had conducted, including videos about the 2005 London subway bombings and a suicide attack on Denmark's embassy in Pakistan.  Hamad continued to encourage Zazi, Ahmedzay and Medunjanin to conduct a martyrdom attack in the United States rather than fight on the battlefield in Afghanistan.  Hamad discussed potential targets with Zazi, Ahmedzay and Medunjanin, including Times Square, the New York Stock Exchange, a major U.S. department store and the New York City subway system.  Ultimately, after further discussions with Hamad and Abdul Hafeez, Zazi, Ahmedzay and Medunjanin agreed that they would not stay to fight in Afghanistan, but would instead return to the United States to conduct a suicide attack.

Following the conclusion of the weapons training, another al-Qaeda member assisted Zazi, Ahmedzay and Medunjanin in returning to Peshawar.  In Peshawar, Zazi gave the al-Qaeda member a laptop, several cameras, memory cards and batteries for al-Qaeda.

Medunjanin returned to the United States in September 2008 because he had a short-term Pakistani visa that was expiring.  Zazi and Ahmedzay each visited their families in Pakistan and Afghanistan, respectively, agreeing that they would return to Waziristan later for more detailed explosives training.

D.    Zazi Receives al-Qaeda Explosives Training

More than a month later, Ahmad returned to Peshawar to bring Zazi and Ahmedzay back to Waziristan for explosives training.  Ahmedzay had not yet returned to Peshawar so Ahmad and Zazi waited approximately a week for Ahmedzay to return.  When Ahmedzay did not return to Peshawar, Zazi and Ahmad went to Waziristan for explosives training without Ahmedzay.  Ahmad first took Zazi to the same guesthouse in Miram Shah where Zazi had stayed on his trip to Waziristan for weapons training, then Abdul Hafeez picked up Zazi at the guesthouse and drove with Zazi to a compound in South Waziristan that was similar to the compound where Zazi had taken the weapons training.

At this second compound, Zazi spent approximately one week attending explosives training.  Specifically, Zazi learned about the different parts of a bomb, such as the main charge and the detonator.  Zazi learned to make two different kinds of detonator

charges, including an acetone peroxide detonator charge commonly referred to as TATP, for triacetone triperoxide. TATP was used in the 2005 London train bombings and intended to be used in the 2001 "shoe bomb" plot by Richard Reid. Zazi also learned how to make multiple kinds of main charge explosives, including one with flour and ghee oil and one with hydrogen peroxide and flour. Zazi learned safety procedures for making these explosives, where to purchase the chemicals needed to make these explosives, how to achieve the right concentration of those chemicals, how to mix the chemicals together, how to package the explosives, and how to detonate the explosives. Zazi also learned how to include ball bearings or nails with the explosives in order to do the most damage. The training also included discussions of more advanced explosives, such as making car bombs. During this training, Zazi kept a notebook in which he took notes on the information that he was learning.

After learning how to make these explosives, Zazi constructed and tested an TATP detonator, constructed and tested a main charge explosive, and saw how to create a "suicide jacket" so that the bomb could be worn without being noticed.

Hamad told Zazi that Zazi needed to conduct his bombing attack within two months to send a message to President Obama, who had just been elected, to pull U.S. troops out of Afghanistan. Zazi worked with Hamad to record a martyrdom "farewell" message that would be released after the attack had taken place.

After Zazi completed his explosives training, Abdul Hafeez met with Zazi again and told Zazi to stay in contact with Ahmad. Abdul Hafeez then brought Zazi back to Miram Shah, and Zazi returned from there to Peshawar.

Zazi saw Ahmad again in Peshawar and gave Ahmad the remaining electronics he had brought from the United States, including laptops, cameras and batteries, and approximately $6,000, all of which were for al-Qaeda's use. Zazi also created a new email address that he gave to Ahmad so that Ahmad could contact him after Zazi had returned to the United States. Zazi and Ahmad agreed that if they discussed the attack over email, they would use coded language so that they would not draw attention from law enforcement. Ahmad instructed Zazi that when Zazi had built the explosives and was ready to carry out an attack, Zazi should reach out to Ahmad and tell him that the "marriage" or "wedding" was ready.

In Peshawar, Zazi reviewed the notes that he had taken during the explosives training and copied over some of the notes that he wanted to keep in another notebook. In early December 2008, at an Internet café in Peshawar, Zazi scanned the shorter version of these notes and emailed the notes to himself at two new email addresses that he created so that he would not be caught with the physical copies of the notes on him. The shorter

version of these notes show that the components of TATP include hydrogen peroxide, acetone, and a strong acid such as hydrochloric acid. The notes specified that acetone was found in nail polish remover, and that hydrogen peroxide could be found at hair salons. The notes also discussed formulations for creating a main charge explosive by mixing flour and ghee oil or flour and hydrogen peroxide.

Before the end of 2008, Zazi and Ahmedzay met in Peshawar. Ahmedzay explained that he had not returned to attend the explosives training with Zazi because Ahmedzay was in Afghanistan with his family and his wife had not wanted him to leave. Zazi described to Ahmedzay the explosives training that he had taken, and showed Ahmedzay the notebook in which Zazi had taken notes about how to build explosives so that Ahmedzay could learn how to construct the explosives as well.

E.     Zazi Plans an Attack in New York City

Zazi and Ahmedzay returned to the United States separately in January 2009. After returning to the United States, Zazi visited a bankruptcy lawyer and filed for bankruptcy so that he would not have to pay the approximately $50,000 that he incurred in credit card debt. Zazi lied in that bankruptcy application, stating that he used the credit cards for his own expenses and falsely representing, among other things, his income, his assets and his marital status.

Shortly after returning to the United States, Zazi moved to Colorado, while Ahmedzay and Medunjanin remained in New York. In late spring of 2009, Zazi traveled to New York for a hearing in his bankruptcy case. At the time, he met with Ahmedzay and Medunjanin in New York City, and they agreed that they were still going forward with the mission. Specifically, they agreed to conduct a coordinated suicide bombing attack during Ramadan, or in approximately September 2009. Zazi also discussed with Ahmedzay the possibility of conducting a car bomb attack on a target like Times Sqaure. However, Zazi was not sure whether he could build a bomb large enough for a car bomb attack.

During the summer of 2009, after returning to Colorado, Zazi reviewed his emailed notes from his al-Qaeda explosives training. Zazi also conducted related Internet searches, such as searches for hydrochloric acid and "bookmarked" a site on two different web browsers for "Lab Safety for Hydrochloric Acid." Zazi also searched a beauty salon website for hydroxide and peroxide. Zazi began purchasing the chemical components that he needed to make a TATP detonator, including acetone, hydrogen peroxide and hydrochloric acid, as well as other supplies. For instance, surveillance videos and receipts reflect that on July 25, 2009, Zazi purchased six bottles of "Liquid Developer Clairoxide," which contains high concentrations of hydrogen peroxide, from a beauty supply store in Colorado.

However, one of Zazi's relatives discovered these supplies and confronted him, leading Zazi to discard most of the materials.

In August 2009, Zazi again traveled to New York. In a meeting with Ahmedzay while at a campsite in Bear Mountain State Park in upstate New York, Zazi advised Ahmedzay that he could make explosives to use in a suicide vest. They discussed attacking the busiest subway lines during rush hour, such as subways leaving Grand Central, to have the biggest impact on New York City.

Zazi intended to make the detonator charges in Colorado, but he needed a place in New York to construct the rest of the bomb. Zazi, Ahmedzay and Medunjanin discussed several locations in New York City where they could finish building the bombs. They also visited a pharmacy in Flushing, Queens, to confirm that the components that they needed were available, but did not purchase those components at the time.

Zazi returned to Colorado, where he again bought the ingredients he needed to construct the detonator charge. For instance, surveillance videos and receipts establish that on August 28, 2009, Zazi purchased twelve 32-ounce bottles of "Ms. K Liquid 40 Volume," a hydrogen peroxide-based product, from the same beauty supply store from which he purchased products the previous month. Instead of keeping these materials in a house where he was living with relatives, Zazi kept the materials in his car and in a storage room. On August 28 and 29, 2009, Zazi rented a hotel room, where he worked on making the proper mixture of chemicals for the TATP detonator charge. Once successful, Zazi brought the TATP mixture back to his residence. Zazi tested a small sample to make sure that the mixture worked properly, which it did. He then returned to the hotel on September 6 and 7, 2009 and created more of the TATP mixture so that he had enough to make three detonator charges: one for Ahmedzay, one for Medunjanin and one for himself.

Zazi's plan was to construct the main charge once he had returned to New York. Based on what he had learned in the explosives training, he believed that the main charge would be good for only a few days after it was mixed. Zazi intended to make the main charge with flour and ghee oil. However, Zazi did not recall exactly what proportions he needed of each, and did not have that information in the notes that he received from Pakistan. As a result, Zazi tried to contact Ahmad, the group's primary al-Qaeda contact, through Zazi's relative in Peshawar. Zazi asked his relative to contact Ahmad and to ask Ahmad to reach out to Zazi. On September 6, 2009, Zazi received an email from Ahmad via the email address "sana_pakhtana@yahoo.com." Zazi wrote back to the email and informed Ahmad, in coded terms they had previously discussed in Pakistan, that the suicide operation was ready to proceed. Zazi also sought the correct proportions for constructing the main charge of flour and ghee oil that Zazi had been taught to make in Pakistan. Zazi sent two

more follow-up emails, each more urgent in tone than the last, seeking the proportions for the flour and ghee oil mixture, but did not receive any response.

On September 9, 2009, Zazi began driving to New York City with the TATP detonator explosives and other supplies necessary to build the explosive devices for the attack, including his laptop computer from which he had accessed the bomb-making instructions. While Zazi did not have the instructions for the correct proportions of ingredients for the flour and ghee oil main charge, he hoped to receive that by the time he arrived in New York. Otherwise, Zazi planned to make a different main charge using hydrogen peroxide and flour.

Although the precise timing of the attacks had not been worked out, Zazi, Ahmedzay and Medunjanin had agreed on the ultimate goal of detonating the bombs during suicide attacks in the New York City subway system.

F.    Zazi Aborts the Plan in the Wake of Law Enforcement Surveillance

Zazi drove from Colorado to New York City. Once in New York, Zazi intended to rent a hotel room that he could use to construct the main charge for the suicide attack.

Zazi was pulled over twice by law enforcement officers en route to New York City: once in Colorado and once while crossing the George Washington Bridge into New York City. After arriving in New York, he went to meet Ahmedzay at Ahmedzay's house in Queens. Zazi was nervous about law enforcement surveillance, so he gave the container of TATP to Ahmedzay, and Ahmedzay hid the container in his house. Zazi and Ahmedzay then drove to a local mosque, while Zazi told Ahmedzay that he was worried he was being followed by law enforcement because he had been pulled over twice. While driving to the mosque, Zazi and Ahmedzay believed that they were being followed by law enforcement. As a result, Zazi and Ahmedzay decided to abandon the subway bombing plot. When they arrived at the mosque, Zazi and Ahmedzay discarded the other supplies that were in Zazi's car. After returning home, Ahmedzay also discarded the TATP that Zazi had given him by flushing it down a toilet.

In addition to the surveillance, Zazi was also concerned about law enforcement scrutiny because he received a phone call from Ahmad Wais Afzali, a religious leader in Queens, advising Zazi that law enforcement had shown Afzali a photograph of Zazi and was asking questions about him.

On September 12, 2009, Zazi flew back to Colorado. Because he was worried about being arrested, Zazi destroyed the hard drive in his laptop with a knife. The next day, the FBI searched Zazi's residence in Colorado, and located his laptop computer, but

discovered that the hard drive had been removed. Zazi retained an attorney and agreed voluntarily to meet with and speak with the FBI in Colorado. In a videotaped interview on September 16, 2009, Zazi spoke with the FBI and lied in the interview by, among other things, telling the FBI that his trip to New York was for business, that the handwritten explosives notes on his computer (which the FBI had recovered during a search) had come from downloading a book from the Internet, and that Ahmedzay and Medunjanin were not involved in any crimes. In meetings with the FBI over the next two days, Zazi continued to lie to the FBI about, among other things, details of his 2008 trip to Pakistan with Ahmedzay and Medunjanin. Zazi admitted taking weapons and explosives training and trying to build an explosive device in the United States, but said that he had acted alone and that Ahmedzay and Medunjanin had not taken any weapons training or been involved in the bomb plot. Zazi also denied having planned to build an explosive device or participate in a terrorist attack while in New York, saying that Colorado was his target.

On September 19, 2009, Zazi was arrested and charged in the District of Colorado with making false statements to the FBI based on the false statements in these interviews. On September 23, 2009, Zazi was indicted in the Eastern District of New York with conspiracy to use weapons of mass destruction.[2]

II.    The Statutory Scheme and Guidelines Calculation

Zazi faces a sentence of up to life in prison on Counts One and Two, and a sentence of up to 15 years in prison on Count Three.[3]

The government agrees with the Guidelines calculation set forth in the PSR. With respect to Count One, the adjusted offense level is 54, based on a base offense level of 42 under Guidelines Section 2M6.1(a)(1) and a 12-level enhancement for a federal crime of terrorism under Guidelines Section 3A1.4(a). With respect to Count Two, the adjusted offense level is 45, based on a base offense level of 33 under Guidelines Section 2A1.5 and a 12-level enhancement for a federal crime of terrorism under Guidelines Section 3A1.4(a). With respect to Count Three, the adjusted offense level is 40, based on a base offense level

_____

[2] The charge of making false statements to the FBI that had been brought in the District of Colorado was dismissed.

[3] Since the defendant's conviction, the statutory maximum sentence for providing material support to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B, has increased from 15 to 20 years' imprisonment. However, the defendant is subject to the lower statutory maximum sentence because his conduct preceded the effective date of the sentence increase.

of 26 under Guidelines Section 2M5.3(a), a two-level enhancement for providing funds and personnel with the intent that they be used to commit a violent act under Guidelines Section 2M5.3(b)(1), and a 12-level enhancement for a federal crime of terrorism under Guidelines Section 3A1.4(a).

Each of these counts is grouped together, pursuant to Guidelines Section 3D1.2(b), yielding a combined adjusted offense level of 54. Three levels are subtracted for Zazi's acceptance of responsibility, yielding a total offense level of 51. However, the Guidelines provide that where the total offense level exceeds 43, the offense level should instead be treated as level 43. Accordingly, the total offense level is 43.

Zazi has no prior criminal history. Although his criminal history category would therefore ordinarily be level I, the application of the terrorism enhancement places Zazi in Criminal History Category VI. Based on an offense level 43 and Criminal History Category VI, the advisory Guidelines sentence is life imprisonment.

III.    Legal Framework

In sentencing a defendant, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which provides "the starting point and the initial benchmark" for sentencing. Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Of course, a court is not bound to impose a Guidelines sentence. See, e.g., United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (Guidelines provide the "starting point and the initial benchmark" for sentencing but are "truly advisory"). Instead, Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court also shall consider, among other things:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment

in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Ultimately, the sentence imposed should be "sufficient, but not greater than necessary, to comply with the purposes set forth in" subsection (a)(2), set forth above.

In addition, as relevant here, Section 5K1.1 of the Guidelines provides that a court may depart at sentencing from the applicable Guidelines range upon a motion by the government where the defendant "has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." U.S.S.G. § 5K1.1. It is left to the discretion of the court to determine the extent of the departure, based upon the consideration of, among other things: (1) the court's evaluation of the significance and usefulness of the defendant's assistance; (2) the truthfulness and completeness of the defendant's information; (3) the nature and extent of the defendant's assistance; (4) any danger or risk of injury to the defendant arising from his assistance; and (5) the timeliness of the defendant's assistance. See U.S.S.G. §§ 5K1.1(a)(1)-(5).

IV.     Substantial Assistance

Zazi began cooperating with the government on February 3, 2010, and was extensively debriefed by the FBI for 14 days before pleading guilty on February 22, 2010.

As noted above, Zazi initially lied to law enforcement officers when he was first questioned in September 2009. While Zazi admitted his own participation in weapons and explosives training, and admitted that he built a bomb after he had returned to the United States, he withheld information about the involvement of his relatives (such as his cousin Amanullah) and his friends (Ahmedzay and Medunjanin) in his activities. Zazi later testified that his motivation for lying was because he was trying to take the blame himself and exculpate his co-conspirators and family members.

Once Zazi decided to cooperate in February 2010, he gave the government his full, complete cooperation. He proffered at great length about every aspect of his conduct without minimizing his actions, nor were there any areas of questioning that Zazi refused to address. His cooperation included implicating his friends (Ahmedzay and Medunjanin) in terrorism crimes as well as telling law enforcement about various acts by Zazi's own family members, such as Amanullah's role in helping Zazi, Ahmedzay and Medunjanin connect with al-Qaeda and Taliban recruiters. Zazi asked prosecutors at the time to leave the door open for Ahmedzay and Medunjanin to cooperate as well.

Zazi's cooperation has continued through the present. Over the past eight years, Zazi has provided extraordinary cooperation, meeting with the government more than

100 times, viewing hundreds of photographs, and providing information that assisted law enforcement officials in a number of different investigations even where Zazi did not personally know the subjects of those investigations.





C.    <u>Direct Assistance in Prosecuting U.S. Cases</u>

Zazi has directly contributed to the prosecutions of numerous individuals by the U.S. government. Most notably, and as discussed below, he testified during trials of Adis Medunjanin and Abid Naseer. His information was also used in connection with the prosecution of other individuals, including Zarein Ahmedzay, Muhanad al-Farekh, and Zazi's father Mohammed Wali Zazi. █████████████████████████████████

1.    <u>Zarein Ahmedzay</u>

Zazi pleaded guilty in February 2010, approximately two months before Ahmedzay began cooperating with the government in April 2010. Had Ahmedzay not cooperated with the government and pleaded guilty, Zazi would have been a witness against Ahmedzay at trial. Undoubtedly, Zazi's guilty plea played a role in encouraging Ahmedzay both to plead guilty and to cooperate with the government.

Based on his own substantial assistance to the government, Ahmedzay was sentenced in December 2018 to 10 years' custody to run concurrently on charges of conspiracy to use a weapon of mass destruction against persons and property within the United States, conspiracy to commit murder in a foreign country, and providing and conspiring to provide material support and resources to al-Qaeda.

2.      Adis Medunjanin

Zazi testified at the trial of Adis Medunjanin in April 2012 before the Honorable John Gleeson.  As noted above, Medunjanin was one of Zazi's friends and co-conspirators in the effort to conduct coordinated suicide bombings in the New York City subway system.

Leading up to Medunjanin's trial, the government met with Zazi extensively to prepare him for his testimony.  During these meetings, Zazi was forthcoming and cooperative, and diligently worked with prosecutors and agents to prepare for trial.

At trial, Zazi's testimony – along with that of Ahmedzay – was critical.  While Medunjanin conceded that he had traveled to Pakistan, and even that he had done so to join the Taliban to defend Muslims in Afghanistan, he denied that he had done so intending to kill Americans.  In addition, Medunjanin argued that he returned to the United States by himself because he did not intend to be a suicide bomber, and that Zazi and Ahmedzay did not include Medunjanin when making their plans to conduct a suicide attack after returning to the United States.  Thus, Zazi's testimony was critical to establishing proof of Medunjanin's understanding of and participation in the conspiracy to kill American soldiers in Afghanistan and to conduct a suicide attack on the New York City subways.

Zazi testified about the origins of the agreement between Zazi, Ahmedzay and Medunjanin to travel to Pakistan to join and fight with the Taliban against American and coalition forces in Afghanistan, their travel to Pakistan and within Pakistan to join al-Qaeda, and the training that he, Ahmedzay and Medunjanin received from al-Qaeda.  Zazi also testified about his, Ahmedzay's and Medunjanin's agreement in Pakistan to conduct a suicide attack in New York City, and their efforts once they had returned to the United States to commit such an attack.

Notably, reflecting the difficulty Zazi had testifying against a close friend, Zazi broke down in tears during his testimony at Medunjanin's trial.

Zazi's testimony during Medunjanin's trial was powerful and compelling. At trial, the jury convicted Medunjanin of all counts of conspiracy to use weapons of mass destruction, conspiracy to commit murder in a foreign country, providing material support to a foreign terrorist organization, conspiracy to provide material support to a foreign terrorist organization, receiving military-type training from a foreign terrorist organization, conspiracy to commit an act of terrorism transcending national boundaries, attempt to commit an act of terrorism transcending national boundaries, use of a firearm or destructive device during and in relation to a crime of violence, and use of a destructive device during and in relation to a crime of violence. Judge Gleeson sentenced Medunjanin to life in prison.

3.     Abid Naseer

Zazi also testified at the trial of Abid Naseer, which took place before this Court in February and March 2015. Working with new prosecutors, Zazi met with the government extensively and worked diligently to prepare for his testimony.

Naseer was charged with conspiring to provide and providing material support to al-Qaeda and conspiring to use a destructive device. A British national, Naseer was the leader of one of three al-Qaeda cells tasked by al-Qaeda external operations leadership with conducting terrorist bombings in Western countries in 2009. Zazi, Ahmedzay and Medunjanin comprised another such cell in the United States. Naseer's cell intended to detonate a bomb at the Arndale Center, a shopping mall in Manchester, England, during Easter week of 2009. A third cell in Norway intended to blow up the headquarters of a newspaper in Denmark that had sponsored a cartoon contest involving the Prophet Mohammed.

Zazi was a critical witness at Naseer's trial. The primary evidence linking Naseer to al-Qaeda consisted of email messages exchanged between Naseer and an al-Qaeda operative using the email address "sana_pakhtana@yahoo.com." This was the same email address that Ahmad had used to contact Zazi after Zazi had returned to the United States. Zazi testified about his own communications with Ahmad via this email address, which included emails that Zazi had sent to the sana_pakhtana email address asking for the proper mix of ingredients to make a main charge of flour and ghee oil.

In addition, Zazi's testimony was critical because he testified about his instruction from Ahmad to use a code in which references to a "wedding" meant a terrorist attack. Reviewing his own email contact with Ahmad, Zazi testified that he had written to Ahmad, "the marriage is ready," meaning that the bombing mission was ready to proceed.

Naseer's own emails with the sana_pakhtana email address also referred to a wedding, allowing the jury to infer that Naseer was discussing a terrorist attack with al-Qaeda.

Following trial, Naseer was convicted on all counts, and this Court sentenced him to 40 years' imprisonment.

4.     Muhanad al-Farekh

Information provided by Zazi was used in a complaint charging Muhanad al-Farekh, a U.S. citizen, with conspiracy to provide material support to terrorists. Zazi was one of several cooperating witnesses whose information was explicitly referenced in the complaint. Al-Farekh was subsequently charged with nine terrorism counts including providing material support to al-Qaeda and conspiring to attack a U.S. military base in Afghanistan in 2009 using vehicle-borne improvised explosive devices.

The government disclosed Zazi's Jencks Act material and included Zazi on its witness list in connection with al-Farekh's trial in September 2017 before the Honorable Brian M. Cogan. Al-Farekh had traveled to Pakistan in March 2007 with fellow University of Manitoba students Ferid Imam and Maiwand Yar. Like Zazi, Ahmedzay and Medunjanin, Farekh, Imam and Yar became radicalized listening to the sermons of Anwar al-Awlaki, traveled from North American to Pakistan, where they made their way to the FATA, ultimately joining up with al-Qaeda. Al-Farekh later worked closely with Abdul Hafeez in al-Qaeda's external operations program.

Zazi met with prosecutors prior to trial to prepare for his testimony. While Zazi did not personally know al-Farekh, Zazi had identified a photograph of Ferid Imam, who had traveled to Pakistan with al-Farekh, as Zazi's al-Qaeda military weapons trainer Yousef. Zazi was also able to offer testimony regarding Abdul Hafeez's leadership role within al-Qaeda's external operations program, which would have corroborated other testimony at al-Farekh's trial about al-Farekh's work with Abdul Hafeez.

The government ultimately elected not to call Zazi to testify at al-Farekh's trial, having elicited testimony through Ahmedzay that was similar to what Zazi would have testified. Nevertheless, Zazi was prepared to testify against al-Farekh had the government called him to do so.

The jury convicted al-Farekh on all nine counts with which he was charged, and Judge Cogan sentenced al-Farekh to 45 years' imprisonment.

5.    <u>Mohammed Wali Zazi</u>

Prior to the defendant's cooperation, Mohammed Wali Zazi (Najibullah Zazi's father) had been charged with conspiring to obstruct justice.  On September 14, 2009, Najibullah Zazi's uncle received a call from a distant relative who advised him that the FBI was aware that Najibullah Zazi had purchased chemicals and that the chemicals were in Zazi's uncle's home in Colorado.  The next day, Wali Zazi and other relatives destroyed the materials that Najibullah Zazi had left in his uncle's house.  Specifically, they poured several bottles of toilet cleaner down a bathroom drain and cut up a protective mask and goggles, which they discarded in a dumpster near Wali Zazi's residence.

Following the defendant's cooperation, which corroborated other evidence the government had developed against Wali Zazi, the government obtained a superseding indictment adding an additional obstruction charge as well as a visa fraud charge based on Wali Zazi falsely claiming his nephew Amanullah as his son in order to bring Amanullah to the United States.

Najibullah Zazi wrote multiple letters to his father following the return of the superseding indictment in which Najibullah Zazi encouraged his father to accept responsibility and plead guilty for his actions.

Wali Zazi rejected his son's advice and proceeded to trial.  The government did not call Najibullah Zazi as a witness against his father.  Wali Zazi was convicted after trial in 2011 of two obstruction counts, and subsequently pleaded guilty to the visa fraud charge, which had been severed from the obstruction charges.  In 2012, Judge Gleeson sentenced Wali Zazi to 54 months' imprisonment.







V.      Request for Downward Departure Pursuant to Section 5K1.1

        Pursuant to Section 5K1.1 of the Guidelines, the government hereby informs
the Court that Zazi provided substantial assistance to the government.  See Melendez, 518
U.S. at 129 ("Section 5K1.1(a) may guide the district court when it selects a sentence below
the statutory minimum, as well as when it selects a sentence below the Guidelines range.").

        As detailed above in Section IV of this letter, the "nature and extent" of Zazi's
assistance has been extraordinary.  See U.S.S.G. § 5K1.1(a)(3).  He provided critical
intelligence and unique insight regarding al-Qaeda and its members, provided information
that led to terrorism charges against numerous individuals, and testified as a witness in two
terrorism trials in the Eastern District of New York, leading to successful criminal
prosecutions and convictions.  Notably, Zazi's cooperation has come at great personal cost to
himself and his family.  Indeed, as part of his cooperation, Zazi implicated his two best
friends, Ahmedzay and Medunjanin, in terrorist activities, and later testified against
Medunjanin at trial.  Zazi's cooperation also required him to provide information about
family members who had been involved in his activities (such as his cousin Amanullah) or
who committed unrelated crimes (such as Zazi's father's commission of visa fraud).  The
government respectfully submits that its evaluation of the assistance rendered by the
defendant should be given significant weight in the Court's own analysis of the "significance
and usefulness of the defendant's assistance."  See U.S.S.G. § 5K1.1(a)(1); United States v.
Rexach, 896 F.2d 710, 713 (2d Cir. 1990)  ("[s]ubstantial weight should be given to the
government's evaluation of the extent of the defendant's assistance").

        In addition, as discussed above, the truthfulness of the information Zazi
provided was corroborated by numerous independent sources.  See U.S.S.G. § 5K1.1(a)(2)

        Zazi's assistance came in the face of substantial potential danger to himself
and his family.  U.S.S.G. § 5K1.1(a)(4).  Terrorist organizations such as al-Qaeda have
publicized the fact that they may target individuals who betray or cooperate against them.
By aligning himself with the government against al-Qaeda, Zazi assumed such a risk.

Finally, Zazi's assistance was timely.  See U.S.S.G. § 5K1.1(a)(5).  Although Zazi initially lied to the government prior to his arrest when he first spoke to law enforcement in September 2009, Zazi ultimately began cooperating with law enforcement in February 2010, sufficiently timely for him to testify against one co-defendant (and potentially against another who pleaded guilty) and to testify in an additional trial years later. Zazi also continued to provide information in a timely manner as new issues and questions arose during the course of his cooperation, and to prepare for and testify at multiple trials.



VI.     Sealing

        The government respectfully requests that this letter be filed under seal.  The government has prepared a redacted version of this letter for public filing, which is attached to this submission, and respectfully requests the Court's permission to file this redacted version on the public docket.

Much of the defendant's cooperation is already public, such as his testimony at multiple trials in this district, but the full extent of the information the defendant has provided is not.

In addition, the government's candid assessment of the specific ways in which the defendant's information proved valuable also is not public.



The extensive information Zazi provided continues to directly contribute to ongoing law enforcement investigations related to national security matters, and revealing that information could jeopardize some of those ongoing investigations. See, e.g., United States v. Amodeo, 44 F.3d 141, 147 (2d Cir. 1995) (need to protect the integrity of an ongoing investigation may be compelling reason justifying sealing). Moreover, in describing the significance of the information that Zazi provided, this letter provides insight into the kinds of strategies that the government has employed and may employ in the future in investigating individuals such as the defendant, and those strategies might be compromised if the letter were made public in full. See Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 120 (2d Cir. 2006) (interests that weigh against disclosure of judicial documents include "the danger of impairing law enforcement . . . efficiency"); Amodeo, 44 F.3d at 147 ("We have recognized the law enforcement privilege as an interest worthy of protection. . . . This privilege is designed to prevent disclosure of law enforcement techniques and procedures"); United States v. Doe, 63 F.3d 121, 128 (2d Cir. 1995) (danger to person may be compelling reason to override public's right of access in courtroom closure context).

In addition, this letter should be filed under seal so as not to reveal the full nature and extent of the defendant's cooperation. Revealing those details will likely harm the ability of law enforcement to secure current and future cooperation from persons similarly situated to the defendant, a fact that also weighs against public disclosure. United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995) ("If release is likely to cause persons in the particular or future cases to resist involvement where cooperation is desirable, that effect should be weighed against the presumption of access.").

Under these circumstances, the parties' countervailing interests outweigh the public's qualified right to access. As the facts set forth above provide ample support for the

"specific, on the record findings" necessary to support sealing, <u>Lugosch</u>, 435 F.3d at 120, the government respectfully requests that the Court record those findings and file this letter under seal.

VII.    <u>Conclusion</u>

       For the foregoing reasons, the government respectfully submits this letter to assist the Court in crafting an appropriate sentence in this case, including by apprising the Court, pursuant to Section 5K1.1 of the Guidelines, of the substantial assistance that the defendant provided to the government.  Under the terms of the cooperation agreement in this matter, the government makes no recommendation to the Court for a specific sentence to be imposed.

       Respectfully submitted,

       RICHARD P. DONOGHUE
       United States Attorney

By:    _____/s/_____
       Douglas M. Pravda
       Assistant U.S. Attorney
       (718) 254-7000

cc:    William J. Stampur, Esq. (by email)
       Shayna Bryant, Senior United States Probation Officer (by email)